UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| TC REINER, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | NO. 3:15-cv-00241 |
|  | ) | CHIEF JUDGE CRENSHAW |
| RYON NISHIMORI and THE TRUSTEES | ) |  |
| OF WATKINS INSTITUTE, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

# MEMORANDUM OPINION

TC Reiner brought this action against Ryon Nishimori and the Trustees of Watkins Institute ("Watkins") asserting multiple claims arising from alleged copyright infringements. (Doc. No. 1.) Before the Court is Defendants' Motion for Summary Judgment. (Doc. No. 47.) For the following reasons, Defendants' motion is **GRANTED**.

I. REINER'S OBJECTIONS TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

Reiner raises five objections to Defendants' Statement of Undisputed Facts: (1) Watkins' interrogatory responses are inadmissible because they were not made on personal knowledge; (2) Nishimori's unverified interrogatory responses are inadmissible because they were not made under oath or on personal knowledge; (3) Jeffery Sedlik's Preliminary Report is inadmissible because it was not made under oath; (4) Defendants' expert opinions are inadmissible because they do not comply with the Federal Rules of Civil Procedure and Evidence; and (5) Kai Chiang's testimony should be disregarded because Defendants did not timely disclose him as a witness. (Doc. No. 54 at 5-11.)

An interrogatory must "be answered separately and fully in writing under oath." FED. R. CIV. P. 33(b)(3). As to Watkins, interrogatories served on it must be answered by an authorized agent "who must furnish the information available to" Watkins. Id. at (b)(1)(B). Parties may use interrogatory answers as evidence in support of a motion for summary judgment. FED. R. CIV. P. 56(c)(1)(A).

Reiner's first objection to Watkins' supplemental interrogatory answers is overruled. Reiner provides no evidence that the responses were not made by an agent furnishing information available to Watkins. Indeed, Watkins' interrogatory answers fully comply with Federal Rule of Civil Procedure 33(b)(3) because they appear to be signed by an agent authorized to do so and there is no evidence to the contrary. (Doc. No. 47-12 at 14.) Therefore, Watkins' interrogatory answers will be considered at summary judgment.

Reiner's second objection to Nishimori's supplemental interrogatory responses is sustained. Nishimori's unsworn interrogatory answers do not include the "statutorily-required affirmation" and will not be considered at the summary judgment stage. Lauderdale v. Wells Fargo Home Mortg., 552 Fed. Appx. 556, 571 (6th Cir. 2014).

Reiner's third objection is sustained. To be admissible at the summary judgment stage, an expert must swear under oath that everything contained in his or her report is true and correct. Sigler v. Am. Honda Motor Co., 532 F.3d 469, 480 (6th Cir. 2008). While Jeffrey Sedlik's expert report is signed, it is not sworn, and therefore the Court cannot consider it at the summary judgment stage. See id. (reversing the district court's granting of summary judgment after the district court improperly relied on three signed but not sworn expert reports). This Court reviewed the expert reports that the Sigler court held the district court improperly relied on, and each expert signed his or her report but did not swear that the information was true and correct under

oath. Sigler v. Am. Honda Motor Co., Inc., No. 1:05-cv-296, ECF Nos. 26-3, 26-4, 26-5 (E.D. Tenn. Jan. 31, 2007). As those are the same facts here, the Court cannot consider Sedlik's report at this stage.

Reiner's fourth objection is overruled as moot. The Court already excluded Sedlik's report based on the third objection.

Reiner's fifth objection is also overruled as moot. As explained in Section III, even with Chiang's testimony, the Court finds a disputed issue of material fact on the authenticity of the independent contractor agreement. As such, Chiang's testimony is not critical to any issue of material fact.

II. UNDISPUTED FACTS

*1. The Agreement*

In 1997, Reiner entered into an independent contractor agreement with SuperStock, Inc. (Doc. No. 56 at 1.) In 1997, photographers who signed independent contractor agreements with SuperStock generally assigned all copyrights for photographs taken under the agreement to SuperStock in exchange for expenses and a fee. (Id. at 2.) Kai Chiang, the Director of Photography for SuperStock, signed the independent contractor agreement ("Agreement") with Reiner.[1] (Id.)

There is a dispute as to the contents of the Agreement that both parties signed. Each party submitted a different copy of the signed Agreement. (Doc. Nos. 47-2, 57-1.) Defendants' submission is signed by both parties, with Reiner's signature appearing twice and parts of the Agreement appearing to have been copied over in other sections. (Doc. No. 47-2.) Reiner

---

[1] In 2008, SuperStock filed for bankruptcy protection. (Doc. No. 64 at 9.) In Bankruptcy Court filings, SuperStock listed all of its assets, but did not list any copyrights as being among its assets despite listing other forms of intellectual property. (Id.) RGB Ventures, LLC, purchased substantially all of SuperStock's assets out of bankruptcy. (Id.) RGB Ventures did not acquire the copyright in "Casablanca" from SuperStock. (Id.) RGB Ventures does not claim to own the copyright in "Casablanca." (Id.)

submitted a copy of the Agreement that only he signed, in which he crossed out the entire paragraph that required "the photographs produced under the agreement become the sole property of SuperStock, and all rights, including the copyright, are hereby assigned to SuperStock." (Doc. No. 57-1.) There are other handwritten sections in Reiner's submission that are also included in Defendants' submission. (Doc. Nos. 47-2 and 57-1.) Reiner does not remember signing the Agreement twice, and does not confidently recognize at least one of the signatures on Defendants' submission purported to be his signature. (Doc. No. 56 at 4.)

Nevertheless, the parties agree that the Agreement contained the following provisions: an effective date of January 16, 1997; a term of one month from February 3, 1997, to March 3, 1997; an obligation of SuperStock to pay Reiner $3,000 and ten percent of sales of photographs taken under the Agreement; an agreement by SuperStock to provide Reiner with access to equipment and materials and to pay "all costs and fees incurred by Reiner . . . limited to model fees, location fees, purchasing and/or rental or props and wardrobe, and hiring of special talent"; an agreement by SuperStock to provide Reiner with a furnished apartment, a vehicle for transportation around Jacksonville, Florida, and a round-trip airline ticket from Santa Barbara, California, to Jacksonville to take the photograph; SuperStock's permission to Reiner to use any photograph produced under the Agreement for his self-promotion or publicity without payment to SuperStock; and SuperStock's agreement to credit Reiner with creating any photographs used by SuperStock. (Doc. No. 56 at 3-4.)

2. *The Photograph*

During the time period covered by the Agreement, Reiner created a photograph that he named "Casablanca." (Id. at 4.) Reiner does not have any documentation showing who paid the expenses for "Casablanca" or who participated in the shoot. (Id. at 5.) The parties dispute whether

Reiner or SuperStock paid the expenses, and what percentage of the expenses each paid. (Doc. No. 64 at 12-13.) Reiner intended to market "Casablanca" to a high-end liquor company, but has never licensed or sold the piece for private use. (Doc. No. 56 at 5; Doc. No. 64 at 11.) Other than licensing "Casablanca" to SuperStock, Reiner has not licensed or refused to license the photograph. (Doc. No. 56 at 5.)

Within a few months of March 1997, Reiner provided "Casablanca" to SuperStock for distribution and sale through SuperStock and its agents. (Doc. No. 47-5 at 19; Doc. No. 57 at 3-4.) He understood that "Casablanca" would be sent to SuperStock, which would then try to sell the photograph to certain liquor companies. (Doc. No. 47-5 at 15-16.) In 2003, Reiner believed SuperStock put "Casablanca" in a catalogue to offer it for licensing and sale. (Doc. No. 56 at 6.) SuperStock did not license any copies of "Casablanca," and Reiner never received any royalties from SuperStock for sales of copies of "Casablanca." (Doc. No. 64 at 20.)

On December 1, 2004, Reiner signed a copyright registration application for "2004 Music & Fashion," a collection of works. (Doc. No. 56 at 6.) On December 6, 2004, the Copyright Office registered his work under the catalog reference "VAu651-781." (Id.) Reiner contends that he included "Casablanca" in the registration for "2004 Music & Fashion." (Id.) While Reiner was in the process of applying to register his compilation, he called the United States Copyright Office twice to ask whether he should register the compilation as published or unpublished, and, if as published, what date to assign the publication. (Doc. No. 64 at 21.) The Copyright Office responded that because Reiner had not published the compilation as a whole, he should register the compilation as unpublished, and the date of completion should be the year of the most recently created photograph. (Id.)

*3. The Assignment*

Watkins is a nonprofit corporation that operates a private college in Nashville, Tennessee, focusing on fine and practical art. (Id.) In 2008, Judith Sweeney O'Bryan, an adjunct professor at Watkins, presented the students in her graphic design class with an assignment called "Synergy." (Id. at 7; Doc. No. 64 at 2.) She required her students to choose one photograph from a set provided to them to create a mock advertisement for a real company. (Doc. No. 56 at 7; Doc. No. 64 at 3.) She created this set of photographs by cutting stock photographs out of magazines and stock photography catalogues and scanning them on her computer. (Doc. No. 64 at 4.) O'Bryan included "Casablanca" in her set, which she removed from a stock photography catalog and scanned onto her computer. (Id.) Nishimori was a student in O'Bryan's class. (Doc. No. 56 at 7.) He chose "Casablanca" from O'Bryan's set for his mock advertisement. (Id. at 7-8.) At this time, "Casablanca" included the title SuperStock had assigned to it, "Play 212U," Reiner's name, and SuperStock's control number. (Doc. No. 64 at 5.) O'Bryan did not contact SuperStock to inquire about licensing "Casablanca." (Id.) O'Bryan did, however, contact her Dean at Watkins to ask whether using any of the photographs would infringe a copyright, and the Dean assured her that it would not. (Id. at 6.)

O'Bryan gave Nishimori a copy of "Casablanca" on a computer file that he used to create a mock advertisement. (Id. at 9; Doc. No. 64 at 7; Doc. No. 47-16 (mock advertisement)). Nishimori removed the title, photographer name, and control number from the photograph to make it fit and work for the assignment. (Doc. No. 64 at 8; Doc. No. 59-5 at 15.) Nishimori uploaded his mock advertisement to his "Flickr" account to archive his work so that it would be available if he

needed to access it somewhere else.[2] (Doc. No. 56 at 9.) Watkins swore that neither it nor O'Bryan used "Casablanca" or the mock advertisement to advertise or promote O'Bryan's class, the Graphic Design department, or the college. (Doc. No. 47-12 at 11.) Watkins further swore that it did not introduce "Casablanca" into any market for photographs or use the photograph to avoid licensing fees, save money for Watkins, keep tuition low, or devalue the photograph. (Id.) In 2011, Watkins stopped using "Casablanca" and the other photographs in connection with O'Bryan's assignment and started using photographs available pursuant to a Creative Commons license, which does not normally require permission from the copyright holder. (Doc. No. 64 at 9.)

III. STANDARD OF REVIEW

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment requires that the Court view the "inferences to be drawn from the underlying facts . . . in light most favorable to the party opposing the motion." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). The opponent, however, has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial'" Matsushita, 475 U.S. at 587. "The mere existence of a scintilla of evidence in support of plaintiff's position, however,] will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a

---

[2] "Flickr is a popular photo-sharing and hosting service with advanced and powerful features." Josh Lowensohn, "Newbie's Guide to Flickr," CNET, June 23, 2008, available at https://www.cnet.com/news/newbies-guide-to-flickr.

fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson, 477 U.S. at 479-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247-49).

IV. ANALYSIS

Defendants seek summary judgment on all four claims in the Complaint: (1) copyright infringement against Watkins; (2) copyright infringement against Nishimori; (3) contributory copyright infringement against Watkins; and (4) violations of § 1202 of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202, against both defendants. (Doc. Nos. 1, 48.)

A. COPYRIGHT INFRINGEMENT CLAIMS

Defendants argue that they are entitled to summary judgment on Reiner's copyright infringement claims because (1) Reiner does not own a copyright in "Casablanca" after he transferred his ownership interest to SuperStock; (2) Reiner's copyright is not valid because Rainer improperly registered his copyright in "Casablanca" as unpublished; and (3) Defendants' use of "Casablanca" constituted fair use. The second and third arguments are affirmative defenses, on which Defendants bear the burden of proof. Balsley v. LFP, Inc., 691 F.3d 747, 758 (6th Cir. 2012).

"A claim of copyright infringement requires proof of '(1) ownership of a valid copyright, and (2) copying of constituent elements of that work that are original.'" Fogerty v. MGM Grp. Holdings Corp., Inc., 379 F.3d 348, 352 (6th Cir. 2004) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)).

*1. Transfer of Copyright Interest*

Defendants argue that they are entitled to summary judgment on Reiner's copyright infringement claims because he transferred his copyright interest to SuperStock, making it undisputed that he does not have "ownership of a valid copyright." (Doc. No. 48 at 11.) Reiner insists that he never transferred his copyright ownership to SuperStock. (Doc. No. 54 at 11.)

The owner of a copyright may transfer his or her ownership "in whole or in part by any means of conveyance or by operation of law . . . ." 17 U.S.C. § 201(d)(1) (2006). The transfer of copyright ownership "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a) (2006). "So long as the parties' intent is clear, a transfer of copyright need not include any particular language." Gilleland v. Schanhals, 55 Fed. Appx. 257, 260 (6th Cir. 2003) (citing Radio Television Espanola S.A. v. New World Entm't, Ltd., 183 F.3d 922, 927 (9th Cir. 1999)). "The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so." Id.

Here, there is a disputed issue of fact as to whether Reiner signed a piece of paper transferring his copyright ownership in "Casablanca." Each party submitted different forms, and it is unclear at this stage when each form was signed or whether the signatures are authentic. Accordingly, there is question of fact as to whether Reiner transferred his copyright ownership in "Casablanca" to SuperStock that a jury must resolve. Summary judgment on this material factual dispute is not appropriate.

## 2. *Validity of Copyright Interest*

Even if Reiner can establish a prima facie case of copyright infringement, Defendants argue that they are entitled to summary judgment on their affirmative defense that Reiner improperly registered his copyright in "Casablanca" by registering his copyright in "2004 Music & Fashion" as unpublished after publishing "Casablanca". (Doc. No. 48 at 18.) Reiner argues that Defendants waived this affirmative defense by first presenting it in their motion for summary judgment. (Doc. No. 54 at 20.)

The Copyright Act provides that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a) (2008). The copyright registration requirement is not jurisdictional, and may be waived. Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 166 (2010). It is the functional equivalent of a failure-to-exhaust affirmative defense from other areas of law. Id.

Here, Defendants concede that this is an affirmative defense that they failed to raise prior to summary judgment. (Doc. No. 63 at 11.) After filing their reply brief to the instant motion for summary judgment, Defendants waited nearly two months before moving to amend their Answer to reflect this affirmative defense. (Doc. No. 66.) On February 15, 2017, the Magistrate Judge denied the motion, ruling that Defendants waived the defense by waiting so long to raise it. (Doc. No. 73.) Defendants did not appeal the Magistrate Judge's ruling to this Court. See FED. R. CIV. P. 72 (allowing parties to appeal a Magistrate Judge's ruling within fourteen days). As the affirmative defense is not in a responsive pleading, Defendants waived the affirmative defense—validity of the copyright registration. Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required."); see Horton v. Potter, 369 F.3d

906, 911 (6th Cir. 2004) ("Failure to plead an affirmative defense in the first responsive pleading to a complaint generally results in a waiver of that defense.") Defendants are not entitled to summary judgment on this affirmative defense.

   3. *Fair Use*

Defendants argue that they are entitled to summary judgment on the copyright infringement claims because it is undisputed that their use of "Casablanca" was fair use, pursuant to 17 U.S.C. § 107, and therefore they are entitled to judgment as a matter of law on that affirmative defense. (Doc. No. 48 at 7.) Reiner, relying heavily on the *en banc* decision in Princeton University Press v. Michigan Document Services, Inc., 99 F.3d 1381 (6th Cir. 1996), argues that Defendants' use of his photograph was not fair use. (Doc. No. 54 at 35.) In Princeton University Press, three publishers of academic books sued a commercial copyshop that was selling university students professor-assigned "coursepacks" containing significant excerpts' of the publishers' books, without paying royalties to the publishers. Id. at 1384–85. The copyshop argued that its actions were protected by fair use, but the Sixth Circuit disagreed. Id. at 1391. Defendants argue that, although this case and Princeton University Press share a general relationship to education, the particular facts of their uses of "Casablanca" support a finding of fair use in a way that the coursepacks at issue in that case did not.

   a. Scope and Purpose of Fair Use

Copyright law generally forbids certain uses of a protected work, including duplication of that work, without the permission of the copyright holder. See 17 U.S.C. § 106 (granting exclusive rights under copyright). The doctrine of fair use, however, creates an exception, allowing otherwise unauthorized uses when the "rigid application of the copyright statute . . . would stifle the very creativity which that law is designed to foster." Princeton Univ. Press, 99 F.3d at 1385. Fair use

11

acknowledges that the ultimate purpose of the copyright system is not merely to restrict use, but to provide a legal structure that "'enrich[es] the general public through access to creative works' . . . by striking a balance between . . . encouraging and rewarding authors' creations while also enabling others to build on that work." Kirtsaeng v. John Wiley & Sons, Inc., 136 S. Ct. 1979, 1986 (2016).

As codified, "the fair use of a copyrighted work, including such use by reproduction in copies . . . for purposes such as . . . teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107 (2006). There are four factors to consider in determining whether the use of a work is fair use:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Id. The fourth factor is potentially the most important in evaluating fair use, but at least it is the "primus inter pares"—or most senior among equals—to which courts should look first because it shapes the entire fair use analysis. Princeton Univ. Press, 99 F.3d at 1385.

The statute "does not, and does not purport to, provide a rule that may automatically be applied in deciding whether any particular use is 'fair.'" David Nimmer, 4 Nimmer on Copyright § 13.05 (2017). "Rather, the factors must be weighed, based on the particulars of any given case, in light of the general purposes of fair use and the copyright system itself. To the "extent that the parties dispute only ultimate conclusions drawn from an admitted set of facts, the court may resolve

the fair use defense as a matter of law on summary judgment, whether for plaintiff or defendant." David Nimmer, 3 Nimmer on Copyright § 12.10(B)(4) (2017).

Here, there are three uses of "Casablanca" that the Court must evaluate separately: (a) O'Bryan's use of "Casablanca" as a material for her students to use to create mock classroom advertisements; (b) Nishimori use of "Casablanca" in his mock advertisement for his classroom assignment; and (c) Nishimori's use of his mock advertisement that uses "Casablanca" on his Flickr as storage so as not to lose it.

    b. O'Bryan's Copying

There is no dispute that O'Bryan used "Casablanca" as part of a set of photographs that her students could use to create a mock advertisement. Neither is there any question that Watkins is responsible for O'Bryan's actions. The question is whether her use of "Casablanca" as a classroom assignment constitutes "fair use."

In the context of this case, O'Bryan made Casablanca available to her students to use or not use. Much like an article from a book, the photograph was offered to help the students in the educational process. The students, not Watkins, would potentially "transform" Casablanca into something more and possibly creative. In evaluating the first factor, the Court must consider "whether the new work is 'transformative,' and whether the use of that work is for commercial or noncommercial purposes." Balsley, 691 F.3d at 758. The record before the Court establishes that the purpose and character of Watkins' use was for nonprofit educational purposes. 17 U.S.C. § 107(1) (2006). Indeed, there is no material factual dispute that Watkins' use was solely educational. In Princeton University Press, the defendants simply copied portions of books for their intended purpose for which they were sold—to be read in order to absorb the information and analysis therein—and did not add anything new to the protected works. Id. ("It should be noted . .

. that the degree to which the challenged use has transformed the original copyrighted works—another element in the first statutory factor—is virtually indiscernible."). Neither did Watkins add anything new to Casablanca. Watkins only used the work as a raw material for a purely educational exercise. Watkins gave the photograph to the students so that the students could learn to create a mock advertisement, not so the students would benefit merely from absorbing the content of the photograph itself. This is a nonprofit educational purpose. The first factor weighs in favor of fair use.

The nature of the copyrighted work weighs slightly against finding fair use. "Courts . . . consider[ ] two aspects of the work in evaluating this factor: first, the extent to which it is a creative work enjoying broader copyright protection as opposed to a factual work requiring broader dissemination, and second, whether it is unpublished, in which case the right of first publication is implicated." Balsley v. LFP, Inc., 691 F.3d 747, 759 (6th Cir. 2012) (quoting Nunez v. Caribbean Int'l News Corp., 235 F.3d 18, 23 (1st Cir. 2000)). Generally, "photographs have varying degrees of creativity." Id. Here, "Casablanca" was more creative than factual, although Reiner did publish it so the right of first publication is not implicated. Viewed in the light most favorable to Reiner, this factor weighs slightly against finding fair use.

The amount and substantiality of the portion used in relation to the copyrighted work as a whole also weighs against finding fair use because Defendants used Reiner's entire photograph. 17 U.S.C. § 107(3) (2006). "While wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use." Balsley, 691 F.3d at 760.

In evaluating the fourth factor, the burden of proof as to the market effect "rests with the copyright holder if the challenged use is of a 'noncommercial' [educational] nature," as it is here. Princeton Univ. Press, 99 F.3d at 1385. The party with the burden of proof would then have

to show that should the challenged use become widespread, it either would or would not "adversely affect the potential market for the copyrighted work." Id. at 1386-87 (quoting Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 567 (1985)).

Here, Reiner has not established any market harm from Watkins' use of "Casablanca." Reiner argues that the effect of the market is that "Casablanca" was available for licensing and Defendants chose to use the photograph without paying for a license. (Doc. No. 54 at 47.) This does not satisfy his burden to show a negative market effect. Princeton Univ. Press, 99 F.3d at 1387 (quoting Am. Geophysical Union v. Texaco Inc., 60 F.3d 913, 929-31 (2d Cir. 1994)). As a preliminary matter, Reiner has not proven even that there is a market for photographs to be used as part of educational design exercises. Reiner, in fact, has not produced evidence of a single instance in which he or anyone else was voluntarily paid for the right to use a photograph in a student-created mock advertisement or other student design project. Reiner has not proven that widespread use of photographs in the manner of Watkins or Nishimori would adversely affect any potential market for his work.

Reiner did not prove that such a revenue stream or market exists for photographs such as "Casablanca." Reiner also did not show that any other professor purchased a license to use "Casablanca," or that schools generally purchase licenses. Instead, he shows that Watkins changed its policy to upload Creative Commons photographs for free—a fact that significantly diminishes the argument that Watkins' use had any negative market affect. As such, this factor weighs strongly in favor of finding that Watkins' educational use of the photograph was fair use.

After weighing all the factors in the light consistent with the purpose of the fair use doctrine, the Court concludes that O'Bryan's educational use of "Casablanca" was fair use. Watkins used the photograph in a nonprofit educational setting and did not profit from the

photograph at all. There is no proof before the Court that any market for using photographs in this setting existed for Watkins to disturb by using the photograph without paying for it. Rejecting the fair use defense and allowing this case to go to trial would stifle the creativity that the fair use doctrine is intended to protect. As such, the Court grants summary judgment to Watkins on the fair use defense.

    c. <u>Nishimori's Uses</u>

Nishimori used "Casablanca" in two ways: first, as a mock advertisement, and second, on his Flickr account as storage.[3] Both of these uses are noncommercial, and while Nishimori used the entire photograph, at least for the first use he transformed it into a mock advertisement for shoe inserts. The first factor weighs in favor of fair use. The analysis on the second and third factors are the same as with Watkins' use, and both factors slightly mitigate against fair use. However, there is no evidence of any potential market harm. Reiner fails to prove that there is a market for students to use photographs provided by their teachers to complete classroom assignments, nor is there a market for paying for storage of the photographs. The fourth factor weighs strongly in favor of fair use. After balancing the factors consistent with the purpose of fair use discussed above, summary judgment is appropriate as to Nishimori as well.

B. CONTRIBUTORY INFRINGEMENT

Given the Court's ruling on the copyright infringement, Watkins is entitled to summary judgment on Reiner's contributory infringement claim because Nishimori did not infringe on any copyright. Contributory infringement "occurs when one, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another." <u>NCR Corp. v. Korala Assocs., Ltd.</u>, 512 F.3d 807, 816 (6th Cir. 2008) (emphasis omitted) (citing <u>Bridgeport

---

[3] While some uses on Flickr may be commercial uses, it is undisputed in this case that Nishimori only used the photograph on his Flickr account to store the photograph so it would not get lost.

Music, Inc. v. WB Music Corp., 508 F.3d 394, 398 (6th Cir. 2007)). "[A] plaintiff must allege: (1) direct copyright infringement [by] a third-party; (2) knowledge by the defendant that the third-party was directly infringing; and (3) [defendant's] material contribution to the infringement." Id. (quoting Parker v. Google Inc., 242 Fed. Appx. 833, 837 (3d Cir. 2007)). As there is no direct infringement by a third party, Watkins is entitled to summary judgment on this claim.

C.  DMCA VIOLATIONS

Nishimori argues that he is entitled to summary judgment on the DMCA violation because he did not know that he was removing copyright management information. (Doc. No. 48 at 39-40.) Watkins argues that it is entitled to summary judgment on the DMCA violation claim because O'Bryan did not have any reason to know that removal of this information for a classroom assignment would "induct, enable, facilitate, or conceal an infringement." (Doc. No. 48 at 40.) Reiner argues summary judgment as to Nishimori is not appropriate because Nishimori knowingly removed information that turned out to be the name of the photographer, the photograph's title, and its copyright control number, even if he did not know what he was removing at the time. (Doc. No. 49.) Reiner further argues that O'Bryan "induced" the removal of the information. (Id. at 50.)

A DMCA violation under 17 U.S.C. § 1202(b)(1) occurs "when a person (1) without authority of the copyright owner or the law (2) intentionally removes or alters any copyright management information (3) knowing or having reasonable grounds to know that it will induce, enable, facilitate, or conceal an infringement of the federal copyright laws." Gordon v. Nextel Comms. and Mullen Advert., Inc., 345 F.3d 922, 927 (6th Cir. 2003).

Summary judgment is appropriate on Reiner's DMCA claim against Nishimori because it is undisputed he did not know or have reasonable grounds to know that removing Reiner's name, the name of the photograph, or the copyright tracking number, would "induce, enable, facilitate,

or conceal an infringement of the federal copyright laws." Gordon, 345 F.3d at 927. Rather, he simply believed that the information detracted from his mock advertisement. (Doc. No. 64 at 8; Doc. No. 59-5 at 15.) As such, Nishimori is entitled to summary judgment on the DMCA claim.

Summary judgment is also appropriate on the DMCA claim against Watkins. For vicarious liability, the plaintiff must prove "(1) a defendant has the right and ability to supervise the infringing conduct and (2) the defendant has an obvious and direct financial interest in the infringement." Id. at 925. As explained when discussing fair use above, there are no facts in the record to show that Watkins had a financial interest in the infringement. Accordingly, Watkins is also entitled to summary judgment on the DMCA claim.

V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 47) is **GRANTED**.

The Court will issue an appropriate order.

                                                 _____
                                                 WAVERLY D. CRENSHAW, JR.
                                                 CHIEF UNITED STATES DISTRICT JUDGE